Our second case this morning is Hildreth v. Butler. Mr. Menegar. Thank you, Your Honor. May it please the Court. Starting, if I may, with the Eighth Amendment Monell claim against Wexford before turning to the ADA claim against the IDOC. In Woodward v. CMS, this Court held that if a private contractor, like Wexford, adopts formal policies designed to protect inmate health, and yet closes its eyes to repeated violations of those policies, it can be held liable for deliberately indifferent custom. And that is this case. A reasonable jury could conclude that Wexford voluntarily assumed ultimate responsibility for Mr. Hildreth's health and medications by contracting with the IDOC, that it adopted two formal medication refill and renewal policies designed to protect inmates from medication gaps, that it knows about Mr. Hildreth's Parkinson's disease, his Mirapex prescription, its efficacy, and the consequences of depriving him of it. And yet, while Mr. Hildreth complied with those policies, Wexford closed its eyes to and did nothing to prevent repeated policy violations by medical staff. You talk about closing eyes. When Hildreth filed the grievances, weren't those deemed an emergency, then expedited in response? They were deemed an emergency, but as Wexford repeatedly says, Wexford's not involved in responding to grievances here, which we think in and of itself shows deliberate indifference. There's no established way for inmates to communicate problems with medications and health needs. And if you look at Dr. Maddox's testimony at A265 of the record, he specifically says that Wexford is in charge of managing the chronic care for this type of patient with medications and evaluations. So it's their responsibility as the ultimate caretakers to set up effective channels for communications. And this court held as much in the Daniel decision that we saw in our reply brief as well. But for a deliberate indifference claim, you need essentially willful disregard of a pattern. And we have at most three random delays in getting the prescription refilled. Yes, Your Honor. Of a couple of days at most. One was a little bit longer. Yes, Your Honor. We don't think that it's three, first of all. We cited eight specifically in the record. Well, there were evidentiary decisions that were made in the district court that narrowed the scope of what was admissible. Yes, Your Honor. Yes, and we contend that that was an abuse of discretion to exclude the two additional instances in the McCown affidavit. But you said that the three are just random. Again, we cite to eight. But I would just like to describe the pattern that repeats itself over and over in the record here. Well, I think you're limited to the three that the district court focused on. Those were the ones that were grieved. The other ones rest on inadmissible evidence, unless you've got a good case that the district court abused its discretion, and that's an uphill climb on an evidentiary ruling. You're limited to the three. We agree that it's an uphill climb, but it's clear that the two instances cited in the McCown affidavit were not hearsay under the party opponent rule. They were employees of Wexford, and they were acting within the scope of their employment. How do we know those two facts? We know them, Your Honor, because first of all, Dr. Maddox testified in his 30B6 deposition with respect to Nurse Kirk, that Nurse Kirk was employed during the period at issue in this litigation. That's at A271 to 272 of the record. And then with respect to Walters, inmate McCown said, under oath, based upon his precipient knowledge, and with no contrary evidence introduced by Wexford, that he believed Nurse Walters worked, I'm sorry, Miss Walters worked for Wexford, and under preponderance standard in Rule 701, that's sufficient. I assume Wexford has pretty good records that ought to be able to confirm or refute that, right? It was not refuted? It was not refuted, Your Honor, and I think that's... Would you suggest to somebody who's currently representing in the district court in a case like this, representing a prisoner that they seek discovery of Wexford's personnel records or the private care provider's personnel records to establish such agency?  Yes. And would nurses for the IDOC fall within the agency given Wexford's overall responsibility for delivery of health care? Yes. Yes. And I think that's important, but I just want to emphasize that those records were sought in this case. Sorry, were or were not? They were. Dr. Maddox specifically testified. We asked him specifically if he knew of any employees who were involved in Mr. Hildreth's care. He couldn't identify a single nurse. He couldn't identify a single doctor who had cared for Mr. Hildreth since 2012. So it's not like there was no effort to specifically identify those Wexford employees in this case. We think that's important here. They come after us for not being able to identify Wexford employees, but their own director in Illinois couldn't name a single employee who had cared for Mr. Hildreth since 2012. And again, going back to the pattern, Your Honor, again, we believe that there are eight instances in the record, minimum, that should be considered here. Over how long a period of time did that stretch? So the first instance occurred in November of 2009, and it extends all the way to November of 2015. But I would emphasize that, repeatedly, Mr. Hildreth states that there were other instances. He said that this happened again in his third grievance. So we think it's critical to consider the first and second instances because they explain that testimony as to why he's saying this happened again. And it also suggests that it could have happened more. So why is it not reasonable to just say, look, we've got a system here. It's not perfect. How do we infer, or how would a jury reasonably infer, even if you get all eight in front of a jury, infer deliberate indifference from spread out over, these are monthly renewals, right, or refills, and spread out over about six years, once a year, doesn't seem like that big a deal. So Your Honor, we want to emphasize that there are violations of the refill and the renewal policy here. So it's not just the refills that are issued that occur every 30 days. It's also the biannual chronic clinics where Wexford doctors are required to see Mr. Hildreth every six months. And we point to three separate instances there where Mr. Hildreth's medications were not renewed. In his testimony alone, he said that he's not examined on a scheduled, repetitive set time, that his medications are automatically renewed despite the six-month rule. And then we point to three gaps where it clearly shows that his medication was not renewed in time, specifically the third, the seventh, and eighth gaps. So we just want to emphasize that there are those two avenues. It's the refill policy and the renewal policy. And then in terms of deliberate indifference, we would just argue that the very act of adopting these formal policies that were designed specifically to counter medication gaps shows an awareness of the risk. And then at the same time, we have these eight instances in the record that suggests that policy, or I'm sorry, that medical staff were departing from those policies. And then third, Mr. Hildreth was doing everything in his power each time, it's undisputed, each time to tell Wexford about these delays, tell the person in charge of his medication about these delays. Didn't Dr. Middick say that one of the three instances would have been as a result of Mr. Hildreth not going to the chronic, the chronic? Yes, the chronic clinics. Clinics, yeah. Yes, but he also admitted that he had not reviewed any of Mr. Hildreth's medication records. He hadn't looked at any of his refill records. He didn't know anything about that. It wasn't based on personal knowledge. But more important, his testimony, he said that he didn't go for some reason. He didn't explain why. So his testimony is perfectly consistent with our theory that Wexford simply failed to deliver the pass for him to go to his chronic clinics. So we don't think that there's, that his testimony undercuts that in any way. And so I explained that Mr. Hildreth is doing everything in his power. The fourth is that Wexford doesn't do anything after that to prevent any future delays or obstructions. Parkinson's is obviously a serious and incurable disease. Only its symptoms can be treated. It's not the common cold. And Wexford is responsible and knows about this, and yet it's adopted this policy in action in this case. It could have created effective channels for communications. It could have exempted him from the refill sticker policy. It could have made sure that he at least gets his passes. It could have made his prescriptions last longer than a year. The bottom line is that it should have made sure that he got his medications. I would just point the court to A148 of the record as well, where Mr. Hildreth explains that at his prior prison, when he had a gap, that staff actually went to the local pharmacy in town to get his medication. So it's not like this is a difficult thing to do. We think that that policy of inaction violates the Eighth Amendment under Monmouth. And we would also just say that the court can't affirm without reaching the shields issue and the respondeat superior issue there. There we think the shields decision in and of itself is comprehensive, and we would like to rest on our brief for that issue. And turning, if I could, to the Title II ADA claim against the IDOC. The IDOC doesn't dispute several legal principles here, that Hildreth is a qualified individual with a disability, that he communicates through writing—I'm sorry, that communication through writing can provide reasonable policy modifications as an independent basis for ADA liability, and that reasonableness is a highly fact-bound inquiry. So their sole merits argument here is that its modifications were reasonable as a matter of law. And as we explain in the briefs, we think that's wrong, and the court should reverse on this claim as well. We want to clarify, because it's confusing in the briefs, that there are only three modifications at issue here. There's the standard library access, help from an officer, and then his ADA attendant. So the IDOC and the district court did it as well, they're improperly focusing on these prior modifications that undisputedly have been rescinded. So for instance, the in-cell typewriter access, the counselor help, extended library access for three days a week, all of those were rescinded by July of 2015, so the period at issue here is from July 9th, 2015 to the present. And again, a reasonable jury could find all three of those current modifications unreasonable. So for standard library access, it's not even really a modification. He gets the same time that all other inmates get. It's undisputed in the record, despite the IDOC's contentions otherwise, that he gets one to one and a half hours a month to use the typewriters there. With respect to the second one, officer help, he said that he's asked officers in the past, and they haven't helped him. Again, we think that modification's unreasonable on its face, asking a guard to help with writing briefs. And then as well, the ADA attendant, he's not an ADA attendant, he's another inmate. He doesn't have a GED, he can't spell, he has poor handwriting, he doesn't want to help Mr. Hildreth. But worst of all, Mr. Hildreth's required to disclose this confidential information to this inmate to share in sort of the deliberative process of drafting. In terms of retrospective relief, Mr. Miniger, are there any provable damages here? There are, Your Honor. We've submitted a motion attaching an Illinois Supreme Court letter, and if you look at the top right of that letter, he writes $38.40 wasted. So he is incurring monetary damages there for things like filing fees. Obviously, it's not a million-dollar case, but this is a person who had a monthly payment plan for a $350 filing fee at $12 in his account when he first filed. So we think that there are monetary damages there. We do have an assertion of sovereign immunity on that score. Yes, Your Honor.  And we think that that argument is waived. If you look to the Song Park decision, this court clearly held that it's a waivable affirmative defense. It's not jurisdictional. We've cited two multiple instances in the record under the Lane decision that show the constitutional dimension here, including returned and potentially worthless court filings, troubled communications with his attorneys in his post-conviction case. And then, as well, I point the court to A297 of the record, where the prison was in a—it's a January 15, 2013, counseling entry where IDOC employees were unable to read Mr. Hilliard's grievance. It says they were completely unsure if this was the issue, as parts of the grievance were hard to read. And in the Grievison decision at 538 F. 3rd at 772 footnote 3, the court made clear that the grievance process is part of access to the courts. So we think that we've shown the requisite constitutional dimension here. The case isn't like King and— King was the mediation case? King was the mediation case, Your Honor, yes, and it's undisputed in that case that there were absolutely no obstacles whatsoever to the plaintiff receiving a full judicial hearing. And that's simply not the case here for the reasons that we've stated. I'd like to reserve that time for questions. That's fine. Thank you. Mr. Sansoni? May it please the Court, Tim Sanson on behalf of Wexford. I'm here with my colleague, Abby Fritz, at counsel table. I think this is a good case to look at the big picture. We have three delays, as Judge Rosenstengel found, that were properly before the district court over a period of 72 months. Two of those instances involve situations in which there's no evidence that Hildreth submitted his refill sticker. That's at the required short appendix, page 25, in which you'll see that Judge Rosenstengel made that decision. Is this medication essentially self-administered? Yes, Your Honor. Once the prescription is delivered to the inmate, the inmate then consumes the medication on his own. Keeps it in his cell? It's not— That's right. Handed out on med rounds? That's right, Your Honor. He's allowed to keep up to 90 pills at one time with this particular medication of Mirapex. And then has to submit seven days before this sticker. Right. That's right. Seven days before the prescription lapses, the inmate is required to turn in a refill sticker. And Judge Rosenstengel found, again, page 25 in the required short appendix, that on So, every three months, this is supposed to—I mean, the prescription is good for a year, but he needs a refill every three months. He gets three months at a time. That's right, Your Honor. And then, one week before, he's to turn in the refill sticker. Three months at a time? 90 pills. These three a day? Oh, I'm sorry, Your Honor. One month at a time. And he turns in one week before. I apologize to make that correction there. Is it clear from the prescription whether he is supposed to take it every eight hours or is he to take it as needed? My understanding is he has to take three per day, that it's not as needed, that he takes three per day over a period of a month. So with respect to the episodes involving nurses Kirk and Walters, did you come forward with any evidence that they did not work for Wexford at the relevant times? I would think that's something you could show pretty easily, isn't it? It could be shown on a document. There is no document that wasn't sought in discovery. I did go to the pages that Appellant's Counsel cited, and the question— I'm talking about your own personnel records. I'm sorry, Your Honor. I'm talking about Wexford's personnel records. Surely, you know who was employed when. The personnel records would show that. I personally don't know the dates for Nurse Kirk, and the only evidence in the record from Dr. Maddox was, do you know whether she has been employed by Wexford? Answer, to my understanding, she was. Question, and when was she employed? Answer, I do not know the specific dates. There was a question later on— Is it correct? Go ahead. Go ahead, sir. There was a question later on at Appendix 272, but it's your understanding she would have worked at Wexford between the 2013 and 2017 time period at issue in this case. His full answer was, generally, yes, sometime in that time frame, but I don't know the specific dates. So we don't know if Nurse Kirk was employed at the time that she allegedly was on rounds and allegedly said that she didn't like the conduct—excuse me, didn't like the demeanor of the inmate. But even if that's all true, if we assume for sake of argument that that's all true, that would be personal misconduct, perhaps, and under the Grieveson decision from the Seventh Circuit, that's attributable to her, not to Wexford. That doesn't show a policy. When you look at the other nurse, Nurse Walters, there's no evidence in the record she ever worked for Wexford. What she said was— Is it correct that Wexford, under its contract with the state, has overall responsibility for health care at the facility? I'm sorry, could you ask that question again, Your Honor? Does Wexford, under its contract with the state, have overall responsibility for health care at the facility? It shares that responsibility with the Illinois Department of Corrections. Shares. Does that mean you each get to point to the other in this kind of a situation? No. But under this Court's decision in Gaston v. Gosch, decided on April 3rd of this year, the Court did say that plaintiff needs to show the who and the why. And at best, we have references to Nurses Kirk and Walters relying on hearsay testimony and a reference— It's not hearsay. Go ahead. We contend it is hearsay because there's no evidence that the nurses worked for Wexford at the time the statements were allegedly made. It's common for nurses to go back and forth between state employment and Wexford employment? And to employment at the Illinois Department of Corrections as well, yes. That's true, Your Honor. At the end of the day, the plaintiff, and looking at the big picture again where I started, the plaintiff has to show a widespread practice that directly caused or was the moving force behind the constitutional violation. So should the plaintiff have sought broader discovery into other prisoners' health records? That would have helped, Your Honor. Now it's true that— And should have sought personnel records? Yes. Do you guys really want to turn that sort of stuff over to prisoner plaintiffs? Well, if we had received the discovery requests, I guess we would have had to look at those individually and determine whether we had a basis to object or to get a protective order, but we never got to that point. Okay. An interrogatory would have done. Yes, that's correct, Your Honor. An interrogatory— Without having to disclose documents. That's right. Absolutely. But that didn't—that wasn't— But the plaintiffs wouldn't be entitled to, for example, check underlying documentation that might verify or disconfirm interrogatory answers, would they? If the interrogatory had been asked, the documents could have been looked at and an answer could have been given about the employment, yes, Your Honor. So I've got to say, the arguments that you all are making here about what's not in this record seem to be an open invitation to much broader discovery, much more intrusive discovery, in order to establish conduct that would qualify under Monell. Potentially could be, Your Honor, yes. Okay. Even in the Glisson case, the court made clear that the institutional policy itself must be deliberately indifferent to the quality of care provided, and going back to the Gaston decision from April 3rd, again, we just don't really have the who and the why. Even if you say we have maybe the who with Kirk and Walters or even Dr. Fahim, we don't have the why. As this court asked in Gaston, was there an intent to cause harm? Was there medical judgment involved? We just don't know those answers, and in light of that, we're having to speculate to get to the point of finding— But what would be the medical reason for the medical judgment involved in interrupting Mr. Hildreth's supply of the drug he needs to treat his Parkinson's? I don't know, Your Honor. I can't imagine one. I don't know. When Dr. Fahim did not immediately renew the prescription for the Mirapex, I don't know why he didn't. It's not on the record either way as to why he didn't. But the burden is on the plaintiff to establish an Eighth Amendment violation, and based on the record that's before the court and that was before Judge Rosenstengel, there wasn't a basis to find an overall widespread policy. Who are the relevant policy makers for Wexford to establish the processes for prescription renewal and refills, and then also for ensuring that those policies are complied with, particularly with respect to prescriptions critical to care? That would be Wexford's medical director. At which level? State, national, regional? This would be at the regional level, Your Honor, and I don't know the name of that person at the time of these events, but that would be the position, Wexford's medical director. For establishing the policies. How about for compliance? There would be oversight responsibility on the medical director for compliance. How about the facility medical director? The facility medical director would also be in the mix, Your Honor. Okay, in the mix is what worries me, particularly because we've got this institutional structure here which diffuses responsibility so thoroughly, and under doctrines adopted under Section 1983, diffused responsibility can wind up meaning nobody's responsible, which is why Shields said what it said. Yes, Your Honor. But I think that Gaston said we have to have the who and the why, and we just don't have that in this case, and I think that's the real issue. Unless the court has other questions, I know the state has some argument to make as well, and I'd like to give them the opportunity to do that unless the court has other questions for me. I do. With respect to the causation issues that you've raised, is there any evidence in this record that Boswell Pharmacy was slow in refill requests? There's no evidence one way or the other, Your Honor. Any evidence that, affirmative evidence, that Plaintiff Hildreth dropped the ball? There's no evidence showing he did or didn't. Any evidence that IDOC staff dropped the ball for any of these refills? Specific evidence? None either way, Your Honor. And it's Wexford that established and administered the system that gave these roles to the IDOC and the pharmacy and the plaintiff in this process, right? They were part of the process, yes, but they weren't solely responsible for delivery of medications. Who's they? They would be the Illinois Department of Corrections would also be involved in that. But it was all under Wexford's responsibility, correct, under the contract? Wexford shared in the responsibility. Shared responsibility. Okay. Thank you. We'd ask the Court to affirm and I'll now turn it over to the State. Thank you for your time, Your Honors. Thank you. Mr. Dozman. May it please the Court, I am Assistant Attorney General Aaron Dozman and I represent Lori Oakley and Kim Butler, the two State Defendants. Title II is about remedying the denial of access to public services caused by disabilities. And the District Court here correctly concluded that the modifications that Hildreth received satisfied Title II's remedial aims because those modifications allowed him to access the courts and communicate otherwise by writing. In the past, Hildreth has had a writing assistant, extra law library time, help from prison staff, and he currently has a typewriter in his cell and his standard law library access. And Hildreth has failed to confront the fact that these modifications work. He chooses not to use... I thought the concern was from July 2015 until you changed the policy and decided to let him have a typewriter again. When was that? He was assigned the writing assistant or the ADA attendant July 9th, 2015. That was the guy who didn't have a GED and according to him... He was a screened individual, yes, despite his... Well, those sound like factual issues, right? Yes. Okay. So... And then when did he get the typewriter back? Or he took the typewriter again? Well it happened after events... After the judgment in the District Court, I believe he got a typewriter in the spring of 2018. This is outside of the record, of course. I have confirmed that he has the typewriter in his cell because he was transferred to a medium security wing of the facility. So it wasn't a change in policy, it was a move from a max to a medium? That's right. Yes. So during that time, his primary modification was the ADA attendant who helped him with writing. So he could draft court documents, whatever communications he wanted to draft. For some period of time, he had increased library access. That's right. When he didn't have the writing assistant, really the extra law library access was three days a week, approximately six hours a day accommodation. And then that switched when he was assigned the attendant who lived with him to help him with various matters, including writing. And that's the time period that's, I guess, now been narrowed by the appellant, that we're looking at July 2015 to present, really. And there's just no evidence that this writing attendant was so deficient that his court filings were inadequate somehow, that he couldn't use the writing assistant, that it was so  The worst thing that happened to Hildreth is that he didn't like the writing assistant. But that doesn't mean that the writing assistant was not a reasonable modification for him to be able to write like any other inmate in his cell. Separately, there are several obstacles to obtaining any monetary or injunctive relief in this case. And for money damages, the punitive damages he asked for are not provided under the ADA and compensatory damages require deliberate indifference. And deliberate indifference requires that someone know of a likely harm or, in this case, inadequate modification or deficient modification, and then ignore that deficient modification or not help fix it. And there's no evidence that either Butler or Oakley ever were put on notice that he had these complaints about the writing assistant. Does the ADA provide for individual liability in this kind of a situation for damages if deliberate indifference is shown or is this, who's the right defendant? Let's assume he's got a rock solid claim for deliberate indifference. Who's the right defendant? The official capacity claims against the individual defendants is sufficient. I believe that is Lacey versus Cook County. This court said that that was sufficient for a proper defendant. So again, state officials in their official capacity. That's right. So, which raises potential Eleventh Amendment issues which have not been raised before this, until this brief court's briefing. They were raised in the answer and I'll, you know, I admit we didn't include it in the motion for summary judgment, but that is not a voluntary relinquishment of that right. But whatever oversight there is, this, of course, DeNovo has DeNovo review and it is a, it is a legal question that can be addressed and I think it's been addressed sufficiently in the briefs. Okay. And then as for the, so for the Eleventh Amendment, there's no, as we, I think adequately briefed, there's no constitutional dimension and as for injunctive relief, it is moved because we now have the typewriter and these two other modifications he can choose between. If he were moved to, back to a maximum security prison, he would lose that? He would lose the typewriter, likely, but he would, we know that he would have the option between the ADA attendant or the extra law library time and that's according to a declaration from the ADA coordinator from Menard. If the court has no further questions for me, we ask that in front of the judge. Thank you. Thank you. Mr. Menegar. Thank you, Your Honor, and just a few points about the claim against Wexford. First of all, they cited Grievous and we just want to distinguish that case. There were four instances over a much shorter time there, it was November, December 2000, January 2001, December of 2001. The only complaint about it once, there was no evidence that dispensing the full bottle there violated any formal policy, so there was no inference that the prison was aware of any risk of theft in that case and thus the instances were random there. Judge Hamilton, you asked about whether Wexford has ultimate authority. I direct the court to A265 of the record and 266 where Dr. Maddox says that Wexford manages the care for this type of patient with medications and evaluations. In terms of pointing to other prisoners, I'd point the court to the Daniel decision that we cite in the reply, the Davis decision, as well as Gleason and Woodward where only one specific inmate was involved there. You also asked about personnel records, and again, I would just point the court, Dr. Maddox could not identify a single employee involved here, so it's unclear whether personnel records would have clarified anything according to their own 30B6 designee's testimony. And then in terms of identifying specific policy makers, as we cite in the brief, it's undisputed there was a revolving door of medical directors here, moving in and out of traveling medical directors. And then with respect to the IDOC claim, we just want to point out that for confidential legal writing, Mr. Hildreth is not a serial litigant. He has only filed two civil cases that we know of. He had two options here, either handwrite illegible documents or scramble to type them during the library, and we think a reasonable jury. Meanwhile, every other guy in the institution was able to draft these documents, and that's his testimony. We think a reasonable jury can find that unreasonable in the EDA. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.